# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00710-COA

**BRIAN SCOTT BERRYMAN A/K/A BRIAN BERRYMAN**                                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

DATE OF JUDGMENT:               06/25/2020
TRIAL JUDGE:                    HON. KELLY LEE MIMS
COURT FROM WHICH APPEALED:      TISHOMINGO COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:              JOHN DAVID WEDDLE
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 11/09/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### WILSON, P.J., FOR THE COURT:

¶1.     Brian Berryman was arrested for unlawful possession of a firearm by a felon and other offenses. Prior to his arrest, Berryman had been on parole from a life sentence for capital murder and had absconded from supervision. Based on his prior parole violations, Berryman's parole was revoked, and he was returned to the custody of the Mississippi Department of Corrections (MDOC) while he awaited trial in the present case. Berryman eventually was tried and convicted of unlawful possession of a firearm by a felon. The trial judge sentenced Berryman as a violent habitual offender to a term of life imprisonment

without eligibility for parole.

¶2.    On appeal, Berryman argues that his constitutional right to a speedy trial was violated by the forty-month delay between his arrest and trial; that his statutory right to a speedy trial was violated by the nineteen-month delay between his arraignment and trial; and that he should not have been sentenced as a violent habitual offender because his indictment did not put him on notice that the State was seeking a life sentence. For the reasons discussed below, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

### *Berryman's Arrest*

¶3.    In the early morning hours of February 6, 2017, David Thacker called 911 and reported that his neighbor, Berryman, had come inside his trailer and fired a gun into his bedroom. Deputy Scott Dalton from the Tishomingo County Sheriff's Office responded to the trailer on County Road 344 in the Goat Island area in the northern part of Tishomingo County. Dalton took statements from Thacker and Thacker's girlfriend, Tina Alexander. Thacker and Alexander both identified Berryman as the shooter. Dalton then entered the trailer and recovered eight spent shell casings from a .22 caliber gun, one live round for a .22-caliber gun, and a pink dog leash that did not belong to Thacker or Alexander. Dalton also observed bullet holes in the bedroom door and in the wall inside the bedroom.

¶4.    Dalton and two other deputies then proceeded to Berryman's house, which was two houses away. Two large dogs were chained up outside the home, and the deputies ordered Berryman to come out and put up the dogs. Berryman put the dogs in a pen and was then

2

arrested. Berryman's face was bruised and bloodied, and he claimed that Thacker had "beat him up." Berryman then told the deputies that he did not have any guns in his house but that they "were free to check." The deputies entered the house and found a .380-caliber pistol behind a speaker in the living room and a .22-caliber rifle in the laundry room behind the washer and dryer. The deputies also found a box of .22-caliber ammunition in the bedroom and a box containing both .22-caliber and .380-caliber ammunition in the laundry room. The deputies also found hydrocodone and oxycodone inside the house.

¶5. Berryman was taken to the Tishomingo County Sheriff's Office. He was advised of and waived his *Miranda* rights and agreed to talk to Investigator Greg Mitchell. Berryman subsequently signed a written statement setting out his version of events. In his written statement, Berryman claimed,

> I have known my neighbor "Tennessee" for less than a year. That was the nickname I knew him by. I was told today by the investigator that his name was David Thacker. I told "Tennessee" that my name was "Rick." I had let "Tennessee" borrow tools from me and DVDs. When he would borrow DVDs, they would be scratched up or something would be wrong with them. "Tennessee" worried me to death about one movie all the time and finally this past weekend, he knew I had some moonshine and asked me to bring it to him where he could get a few shots of it. I went over to his trailer and let him and his girlfriend, Tina, have a couple shots of the "shine." While I was sitting on the couch, "Tennessee" began asking me again about borrowing that DVD. I told him again he couldn't borrow it and the next thing I knew, "Tennessee" had hit me across the face and knocked my glasses off. He hit me about three times in the face and was telling me, like he has always, that I didn't know who I was messing with. I left and I was really pissed about him hitting me, so a little bit later, I grabbed my .22 rifle and my .380 pistol and drove over to "Tennessee" trailer. I went up the back porch and opened the door. The bedroom was to the right and I yelled "Hey Tennessee!" At this time, he jumped up from the bed and grabbed the barrel of my rifle. [Tina] ran toward the front door and I then fired off what I thought was three or four rounds to make him let go of the barrel. When he let go, "Tennessee" ran past me on the

3

wooden porch and fell through it. He pulled himself up and ran down the stairs of the porch heading back down the road toward my house. At some point, my dog lead fell out of my jacket and I didn't know that it had until I was shown a picture of it laying in the floor of "Tennessee" trailer by the investigator. I walked back to my vehicle and drove back to my house. I knew the law would be coming, so I turned on the lights to my house and started getting drunk. My only intention that night was to "scare" him and I think I done that. I wasn't going to kill them because if I was, I would had just shot them both while they were in bed, but I didn't.

¶6. Berryman had been paroled from his life sentence for capital murder in 2009, but he had absconded from supervision in 2013. Thus, by the time of Berryman's arrest in this case, there was already an outstanding warrant for his arrest for parole violations. After Berryman's arrest, he was remanded to MDOC's custody, and his parole was revoked.

### Pretrial Proceedings

¶7. In September 2017, a Tishomingo County grand jury indicted Berryman for shooting a firearm into a dwelling and unlawfully possessing a firearm as a felon.[1] Berryman was indicted as a violent habitual offender based on his prior convictions for robbery, armed robbery, burglary of a dwelling, and capital murder.

¶8. In June 2018, Berryman filed a pro se demand for trial and motion to dismiss in which he alleged a denial of his right to a speedy trial. Berryman also requested appointed counsel. In October 2018, Berryman filed another pro se demand for trial and motion to dismiss.

¶9. On November 7, 2018, Berryman was finally arraigned. The court appointed John White to represent Berryman. However, White had been elected to the circuit court (without opposition) on November 6, 2018. Therefore, White was unable to represent Berryman after

---

[1] Berryman was also separately indicted for two counts of possession of a controlled substance (hydrocodone and oxycodone). Those charges are not at issue in this appeal.

4

his arraignment. The arraignment order, which both White and Berryman signed, stated that the case was "continued on motion of the Defendant and set for trial during the next regularly scheduled term." On November 21, 2018, Berryman filed another pro se demand for trial, motion to dismiss, and motion for appointed counsel.

¶10. On January 7, 2019, the court entered an order appointing Richard Bowen to represent all indigent defendants in Tishomingo County. However, the order was not filed in this case, and Berryman was never told that Bowen was representing him. Bowen was listed as Berryman's attorney on the criminal dockets for the May 2019, September 2019, January 2020, and April 2020 court terms. However, sometime in the first half 2019, Bowen, a former assistant district attorney, realized that he had a conflict because he had previously prosecuted Berryman for capital murder. Bowen then informed Daniel Sparks, who was the conflict public defender, that he would need to represent Berryman.

¶11. In April 2019, Berryman filed another pro se demand for trial and motion to dismiss.

¶12. In June 2019, the court entered an order continuing the case. The order stated that the continuance was granted "on Motion of the Defendant" and was signed by Sparks as counsel for Berryman. However, the record does not contain a prior motion for a continuance, entry of appearance by Sparks, or order appointing Sparks. At a subsequent hearing, Berryman testified that he met Sparks for the first and only time in September 2019. He said that Sparks "introduced himself" and that they "had about a fifteen minute conversation."

¶13. In October 2019, Berryman filed a pro se motion to dismiss for want of prosecution, again alleging a denial of his right to a speedy trial. He also filed another pro se motion for

appointed counsel.

¶14. In November and December 2019, Berryman attempted to appeal the June 2019 order continuing his case. Berryman alleged that he had only recently become aware of the order. He also alleged that Sparks lacked authority to request a continuance because Sparks had never been appointed to represent him. Berryman also continued to maintain that he had been denied a speedy trial. However, the Supreme Court dismissed Berryman's appeals for lack of an appealable final judgment. *Berryman v. State*, No. 2020-TS-00198 (Miss. July 9, 2020); *Berryman v. State*, No. 2020-TS-00218 (Miss. July 9, 2020).

¶15. In January 2020, Berryman filed a motion for the recusal of Circuit Judge Paul Funderburk. Berryman argued that Judge Funderburk should recuse because he had been a prosecutor in a case in which Berryman was convicted of robbery in 1983. In March 2020, Judge Funderburk recused himself "[t]o avoid even the appearance of impropriety."

¶16. In March 2020, Circuit Judge Kelly Mims (the trial judge) ruled on Berryman's multiple motions to appoint counsel. The trial judge stated that although Berryman was correct that no order appointing counsel had been entered, Berryman had been and continued to be represented by counsel. The judge noted that White had been appointed to represent Berryman at his arraignment, although White could not continue the representation due to his election to the circuit court. Therefore, Berryman's case was eventually assigned to Sparks, although no order appointing Sparks had been entered. Therefore, on March 16, 2020, the judge entered an order appointing Sparks "nunc pro tunc."

¶17. In April 2020, Bowen filed a motion for discovery on behalf of Berryman. As noted

6

above, however, prior court orders and statements in the record indicate that Bowen had realized a conflict and ceased representing Berryman months earlier. There is no explanation in the record for why Bowen filed this motion.

¶18. In April 2020, Berryman filed a petition for writ of mandamus in which he asked the Supreme Court to order the trial court to rule on his October 2019 motion to dismiss for want of prosecution. In response, the trial judge informed the Supreme Court that Berryman had never attempted to notice his pro se motion for a hearing. In addition, the trial judge ordered the State to respond to Berryman's motion and set the motion for a hearing on June 22, 2020. Based on the trial judge's response and order, the Supreme Court dismissed Berryman's mandamus petition. *Berryman v. State*, No. 2020-TS-00198 (May 5, 2020); *Berryman v. State*, No. 2020-TS-00218 (May 5, 2020).

¶19. On June 11, 2020, the trial judge appointed Will Bristow to represent Berryman. Bristow was appointed because Sparks had been elected to the Mississippi Senate in 2019, and the 2020 Regular Session of the Legislature continued until October 2020. It does not appear that Sparks ever played any substantive role in this case.

¶20. On June 22, 2020, Bristow filed a motion to suppress Berryman's post-arrest statements to law enforcement and a motion to suppress the guns found during the search of Berryman's home. The motions alleged that Berryman was intoxicated at the time he made his statements and consented to the search.

### *Speedy-Trial Hearing*

¶21. On June 22, 2020, the trial judge held a hearing on Berryman's speedy-trial motion

7

and motions to suppress. During the hearing, Berryman testified that potential defense witness Marshall Edge had died on February 22, 2018. Berryman testified that Edge lived in a house between the house where Berryman was staying and the Thacker/Alexander trailer. According to Berryman, Edge was sitting on his porch during part of the night in question and could have testified that Berryman did not have a gun with him when he walked back to the Thacker/Alexander trailer. Berryman had attached Edge's obituary in support of his prior pro se motions.

¶22. Berryman also testified that another neighbor, Nancy Brooks, had told him that Edge wanted to testify in his behalf. Berryman said that Brooks knew Edge and was with him when he died. Berryman also testified that he had communicated with Brooks by letter and telephone while he was incarcerated. However, Berryman did not call Brooks as a witness at the hearing. Berryman also claimed that Edge had written a letter to the Parole Board in support of Berryman. However, Berryman could not produce a copy of the letter.[2]

¶23. Following the hearing, the trial judge found that Edge's death had prejudiced Berryman's defense on Count I of the indictment (shooting into a dwelling) but that Berryman had not suffered any prejudice with respect to the Count II (unlawful possession of a firearm by a felon) or the two separate drug charges. *See supra* note 1. In addition, after

---

[2] Berryman also testified that another potential defense witness, Clinton Buddy Holley, died about six months after Edge. Berryman claimed that Holley could have testified that Thacker had attempted to sell him a .22-caliber rifle. However, Berryman offered no other evidence of Holley's existence or his death. The trial judge found that Berryman's claim regarding Holley was too "speculative" and not credible, and Berryman does not mention Holley in his brief on appeal.

considering the totality of the circumstances and the *Barker* factors,[3] the trial judge found that Berryman's right to a speedy trial had been violated with respect to Count I but not with respect to Count II or the drug charges. Accordingly, the trial judge dismissed Count I of the indictment only and denied Berryman's motion to dismiss Count II and the drug charges. The trial judge subsequently entered a written order summarizing his findings and rulings. The trial judge also denied both of Berryman's motions to suppress.[4]

### *Trial*

¶24.    Berryman's trial began the next day. Deputy Dalton, Investigator Mitchell, and the two other deputies involved in Berryman's arrest testified. The State also introduced Berryman's written statement. Neither Thacker nor Alexander testified.[5]

¶25.    Berryman was the only defense witness. His testimony at trial varied significantly from his written statement. We summarize his testimony as follows: Berryman's brother, who lived in Chicago, owned the house on County Road 344 where Berryman was arrested. Berryman stayed there off and on while he did work on the house for his brother. Thacker and Alexander lived in a trailer nearby, and Berryman had known them for about a year. Around 8 p.m. on February 6, 2017, Thacker invited Berryman over to his trailer. Berryman

---

[3] *Barker v. Wingo*, 407 U.S. 514 (1972).

[4] On appeal, Berryman does not challenge the denial of his motions to suppress.

[5] Mitchell testified that he tried to talk to Thacker and Alexander a few days after the shooting but could not find them. He further testified that he had "tried to locate [Thacker and Alexander] through various means through law enforcement and could not locate them." Mitchell also acknowledged that Thacker and Alexander had provided "misleading information as far as Social Security numbers and whatnot."

brought some moonshine, and he, Thacker, and Alexander drank for about two hours.

¶26.    Around 10 p.m., Thacker asked Berryman to borrow $25 to buy some crystal meth, but Berryman refused.  A short time later, Thacker left the room, and Alexander urged Berryman to loan Thacker the money.  Alexander told Berryman that she wanted to get high, that she would make sure he got his money back, and that she would have sex with him while Thacker was gone.  Berryman then loaned Thacker the money.  Thacker asked Berryman if he wanted to go with him to buy the drugs, but Berryman asked Thacker just to drop him off at his house.  After Thacker drove Berryman home, Berryman walked back to the Thacker/Alexander trailer, and Alexander began performing oral sex on him.

¶27.    Thacker walked in on Berryman and Alexander.  Thacker "was very upset" and carrying a rifle.  Berryman tried to close the bedroom door on Thacker, but Thacker fired several shots into the bedroom.  Berryman tried to take the rifle from Thacker, but "it fired a couple of more times" while they struggled over it.  While the two men fought, Alexander ran out of the trailer.  Berryman finally took the gun from Thacker.  Thacker threatened to kill Berryman but then ran away, leaving Berryman alone in the trailer.

¶28.    Berryman returned to his brother's house with the rifle.  He hid the rifle in the laundry room behind the washer and dryer.  Berryman knew that as a convicted felon he was not allowed to possess a gun,[6] but Thacker "was trying to kill [him] with [the rifle]," and he "wasn't fixing to leave [Thacker] nothing to kill [him] with."  Berryman drank some whiskey and did a line of crystal meth while he "kept a watch out" for Thacker.  Around 11 p.m.,

_____

[6] Berryman stipulated that he had a prior felony conviction, and the stipulation was read to the jury.

10

Thacker entered the house unannounced. The two men argued and began fighting again, and Thacker pulled out a pistol, which he fired into the floor during the altercation. Then one of Berryman's dogs, a German Shepherd-and-Chow mix named Eli, "bit [Thacker] on the back side of his leg and snatched him to the ground." Berryman called Eli off of Thacker, and Thacker left the house, cursing and threatening to kill Berryman as he went. Berryman thought that Thacker must have dropped his pistol during their fight and that it was the same pistol that deputies later found behind a speaker in the living room.

¶29. Berryman then drank some more whiskey and did some more crystal meth, and the deputies arrived and arrested him a few hours later. Berryman denied that he consented to a search of his brother's house, he denied that he made any oral statement to Mitchell, and he denied that he signed or ever saw the written statement that was admitted into evidence at trial. He claimed that the signature on the statement was forged.

¶30. On cross-examination, Berryman was unable to explain the boxes of .22-caliber and .380-caliber ammunition found in the house. He testified that he did not take any boxes of ammunition with him when he left Thacker's trailer.

¶31. The jury found Berryman guilty of unlawfully possessing a firearm as a felon, and the court sentenced him as a violent habitual offender to life imprisonment without eligibility for parole. Berryman filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal. On appeal, he argues that the felon-in-possession charge should have been dismissed because he was denied a speedy trial and that he should not have been sentenced as a violent habitual offender because his indictment did not put him

11

on notice that the State would seek a sentence of life without parole.

## ANALYSIS

### I.  Speedy Trial

#### A.  Constitutional Right

¶32.  The Mississippi Constitution and the United States Constitution both protect the defendant's right to "a speedy . . . trial."  Miss. Const. art. 3, § 26; U.S. Const. amend. VI. "When considering an alleged violation of a defendant's [state or federal constitutional] right to a speedy trial, [the Mississippi Supreme] Court applies the four-part test developed by the United States Supreme Court in *Barker*," *supra* note 3.  *Newell v. State*, 175 So. 3d 1260, 1269 (¶19) (Miss. 2015).  "The *Barker* test 'requires a balancing of four factors: (1) length of delay; (2) reasons for the delay; (3) defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant.'"  *Reed v. State*, 191 So. 3d 134, 139 (¶8) (Miss. Ct. App. 2016) (quoting *Taylor v. State*, 162 So. 3d 780, 783 (¶6) (Miss. 2015)).  *Barker* "held that courts must 'engage in a difficult and sensitive balancing process' of the four factors because none of the factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.'"  *Id.* (quoting *Barker*, 407 U.S. at 533). "No mathematical formula exists according to which the *Barker* weighing and balancing process must be performed."  *Flora v. State*, 925 So. 2d 797, 815 (¶61) (Miss. 2006).

¶33.  A trial judge's ruling on a speedy-trial claim encompasses questions of fact, including whether there was "good cause" for a delay and whether the defendant has been prejudiced

12

by any delay. *State v. Woodall*, 801 So. 2d 678, 680-81, 687 (¶¶7, 29, 31) (Miss. 2001). We must affirm the trial judge's factual findings if they are "supported by substantial, credible evidence." *Id.* (quotation marks omitted). We will reverse the trial judge's factual findings only if there is "no probative evidence" to support them and they are "clearly erroneous." *Id.*

### 1. Length of the Delay

¶34. "[T]he constitutional right to a speedy trial attaches when a person has been accused." *Stark v. State*, 911 So. 2d 447, 450 (¶7) (Miss. 2005) (quoting *Hersick v. State*, 904 So. 2d 116, 121 (¶5) (Miss. 2004)). Therefore, the speedy-trial clock begins running "with the defendant's arrest, indictment, or information," whichever occurs first. *Id.* "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. It is now well settled that "any delay exceeding eight months is presumptively prejudicial" and requires analysis of the remaining *Barker* factors. *Stark*, 911 So. 2d at 450 (¶7) (citing *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989)).

¶35. In this case, Berryman was arrested on February 6, 2017, but was not tried until June 23, 2020, a delay of more than forty months. Thus, the length of the delay is presumptively prejudicial. However, our Supreme Court has made "clear" that this "does not mean that *actual* prejudice to the defendant exists. Rather, actual prejudice is determined at a different point in the *Barker* analysis." *Graham v. State*, 185 So. 3d 992, 1005 (¶41) (Miss. 2016) (quoting *Johnson v. State*, 68 So. 3d 1239, 1242 (¶7) (Miss. 2011)). A delay in excess of

13

eight months simply means that we must analyze the remaining *Barker* factors. *Id.* at (¶40).

## 2. Reasons for the Delay

¶36. "When the length of the delay is presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay." *Bateman v. State*, 125 So. 3d 616, 629 (¶45) (Miss. 2013). "This Court must then determine whether the delay is attributable to the State or the defendant." *Collins v. State*, 232 So. 3d 739, 745 (¶20) (Miss. Ct. App. 2017), *cert. denied*, 229 So. 3d 123 (Miss. 2017). Different reasons for delay are assigned different weights. *Barker*, 407 U.S. at 532. "'Deliberate attempts to delay the trial in order to hamper the defense are weighed heavily against the State. On the other hand, 'a more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" *Collins*, 232 So. 3d at 745 (¶20) (quoting *Hardy v. State*, 137 So. 3d 289, 299 (¶30) (Miss. 2014)). Basically, "the State must prove either that the defendant prompted the delay or that the State had good cause." *De La Beckwith v. State*, 707 So. 2d 547, 606 (Miss. 1997). "We will uphold a trial court's factual determination regarding whether delay arose from good cause if it is based on substantial, credible evidence." *Reed*, 191 So. 3d at 139 (¶9) (citing *DeLoach v. State*, 722 So. 2d 512, 516 (¶12) (Miss. 1998)).

### i. Arrest to Indictment

¶37. In this case, approximately seven months elapsed between Berryman's arrest in February 2017 and his indictment in September 2017. The State argues that this delay should

14

not be counted against the State because it was still attempting to locate the victims, and its investigation of the crime was not yet complete on May 22, 2017, when the next available grand jury was empaneled following Berryman's arrest. The State presented the case to the next grand jury in September 2017. Citing *Woodall*, *supra*, the trial judge found this to be a reasonable investigative delay and, thus, a "neutral delay" that should not be weighed against the State or Berryman. There is substantial evidence to support the trial judge's finding. In *Woodall*, our Supreme Court stated that "investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." *Woodall*, 801 So. 2d at 682 (¶15) (quoting *United States v. Lovasco*, 431 U.S. 783, 795 (1977)). The trial judge did not err by finding that the investigative delay in this case is neutral or weighs "only slightly against the State." *Id.* at 684 (¶19).

### ii. Indictment to Arraignment

¶38. About fourteen more months passed between Berryman's indictment and his arraignment in November 2018. The State says that this delay occurred because the capias and indictment had not been served on Berryman. Although the State's explanation is not entirely clear, the State seems to say, as the trial judge put it, that "the State was unaware of where [Berryman] was." The trial judge rightly found this explanation to be inadequate because Berryman was "in the custody of the State" the entire time, and "it's incumbent on the State to know where [persons in its custody] are." *Cf. Cressionnie v. State*, 797 So. 2d 289, 292 (¶8) (Miss. Ct. App. 2001) (stating that for speedy-trial purposes "the State of Mississippi is a monolithic entity" and that the "prosecution cannot excuse the failure of the

State to act by ascribing that inactivity to the Governor"). Moreover, despite not having been served with an indictment or arraigned, Berryman filed two pro se demands for trial and motions to dismiss during this time, both of which clearly showed that he was being held at the South Mississippi Correctional Institute in Leakesville. A simple search of MDOC's public website or a phone call should have revealed the same. The trial judge found that this delay had to be weighed against the State, but citing *Adams v. State*, 583 So. 2d 165, 168 (Miss. 1991), he found that it should not "weigh . . . heavily" against the State "because it was negligent and not intentional." While we agree with the trial judge that there is no evidence of bad faith or malicious intent on the part of the State, we conclude that such a lengthy delay in arraigning an unrepresented defendant who is already in state custody must weigh more heavily against the State.

### iii. Arraignment to First Trial Setting

¶39. About two months passed between Berryman's arraignment and the first available trial setting in January 2019. The trial judge found that this delay was attributable to and weighed against Berryman because Berryman and his new counsel, John White, who was appointed at the arraignment, both signed a standard form arraignment order continuing the case to the next trial setting "on motion of the Defendant." The trial judge reasoned that a new attorney needed time to request discovery, meet with the defendant, and investigate the charges.

¶40. Ordinarily we would agree that a continuance requested by defense counsel for such reasons would weigh against the defendant. *May v. State*, 285 So. 3d 639, 649 (¶30) (Miss. Ct. App. 2019) (holding that a defendant "is bound by his lawyer's decisions as to the timing

16

of trial and the need for a continuance" despite the defendant's prior "pro se demand for a speedy trial"), *cert. denied*, 284 So. 3d 751 (Miss. 2019). But in the circumstances of this case, we cannot weigh this delay against Berryman, who by this time had already been in state custody for almost two years. The fact that Berryman still had not been appointed counsel or received any discovery at this late date is the fault of the State, not Berryman. Furthermore, it was known at the time of White's appointment that he could not represent Berryman because he had already been elected to the circuit court and would take office prior to the next available trial setting.

### iv.     January 2019 to September 2019

¶41.    The next period of delay is attributable to Bowen's withdrawal due to a conflict and a request for a continuance made by Sparks, albeit without Berryman's consent or approval. The trial judge found that the delay caused by Bowen's withdrawal was neutral and that the delay caused by Sparks's request for a continuance counted against Berryman. Ordinarily we would agree with this analysis. *See, e.g.*, *Wiley v. State*, 582 So. 2d 1008, 1012 (Miss. 1991) (stating that delays caused by the withdrawal of defense counsel "cannot be weighed against the State"); *May*, 285 So. 3d at 649 (¶30). But in the particular circumstances of this case, we cannot attribute any part of this delay to Berryman. Sparks requested a continuance only because the case had only recently been assigned to him. The fact that Berryman was without counsel who could actually represent him for more than two years after his arrest was not Berryman's fault. Indeed, Berryman had made multiple requests for appointed counsel prior to this time. Accordingly, we conclude that this eight-month delay related to Bowen's

17

withdrawal is simply neutral.

### v. September 2019 to January 2020

¶42. Berryman's case was assigned to Circuit Judge James L. Roberts Jr., since-retired, during the September 2019 term of court. However, Judge Roberts was ill and unable to preside during that term. The trial judge found that delay due to Judge Roberts's unavailability could not be counted against the State. We agree that this delay is neutral. *See State v. Magnusen*, 646 So. 2d 1275, 1281 (Miss. 1994).

### vi. January 2020 to April 2020

¶43. Judge Roberts was still unavailable in January 2020. As a result, on January 13, 2020, Judge Funderburk entered an order cancelling the January 2020 term of court for Tishomingo County. On January 21, 2020, Berryman filed a pro se motion to recuse Judge Funderburk on the ground that he had prosecuted Berryman in an unrelated case in 1983. Several weeks later, Judge Funderburk recused himself "[t]o avoid even the appearance of impropriety." It does not appear that Judge Funderburk's recusal caused any delay in the case. In any event, a judge's unavailability due to illness and a judicial recusal are both neutral reasons for delay that do not count against either party. *Magnusen*, 646 So. 2d at 1281; *Scott v. State*, 231 So. 3d 1024, 1041 (¶72) (Miss. Ct. App. 2016), *aff'd by an equally divided court*, 231 So. 3d 995 (Miss. 2017).

### vii. April 2020 to June 2020

¶44. No trials could be held during the next scheduled term of court in April 2020 because MDOC was not transporting prisoners due to the COVID-19 pandemic. *See also* Emergency

Administrative Order–2, *In re Emergency Order Related to Coronavirus (COVID-19)*, No. 2020-AD-00001-SCT (Miss. Mar. 15, 2020) (authorizing judges "to postpone any jury trials . . . scheduled through May 15, 2020"). The resulting delay is not weighed against either party. Berryman's case finally proceeded to trial on June 23, 2020.

### viii.    Summary of Reasons for Delay

¶45.    In summary, the approximately seven-month delay between arrest and indictment is neutral or weighs slightly against the State; the approximately fourteen-month delay between indictment and arraignment weighs against the State; and the post-arraignment delay of approximately nineteen months—due to changes in counsel, the illness of a judge, and COVID-19—is neutral and is not weighed against either party.

### 3.    Assertion of the Right to a Speedy Trial

¶46.    Berryman clearly and repeatedly asserted his right to a speedy trial, beginning before he was even arraigned. The trial judge found, and the State concedes, that this factor favors Berryman. We agree.

### 4.    Prejudice

¶47.    "To determine whether the delay resulted in actual prejudice, the Court considers three interests that the right to a speedy trial was meant to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Taylor*, 162 So. 3d at 787 (¶16) (quoting *Jenkins v. State*, 947 So. 2d 270, 277 (¶21) (Miss. 2006)). "Of these three interests, the last is the most important; and when violated, the most prejudicial to the defendant." *Collins*,

19

232 So. 3d at 746 (¶26) (quoting *Hersick*, 904 So. 2d at 123 (¶18)). "Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation." *McCormick v. State*, 183 So. 3d 898, 903 (¶21) (Miss. Ct. App. 2015) (quoting *Sharp v. State*, 786 So. 2d 372, 381 (¶19) (Miss. 2001)). The defendant "bears the burden of showing actual prejudice, since the defendant is clearly in the best position to show prejudice under this prong." *Reed*, 191 So. 3d at 141 (¶19) (brackets and quotation marks omitted).

¶48. On appeal, Berryman does not claim prejudice in the form of "oppressive pretrial incarceration" or "anxiety or concern." These interests are inapplicable in this case because Berryman had violated his parole prior to being charged in this case, and he was returned to MDOC's custody to serve his life sentence for capital murder for that reason. Put simply, Berryman would have been incarcerated at all relevant times regardless of any delays in the prosecution of this case.

¶49. Thus, the only issue under this factor is whether Berryman met his burden of proving that delays in the case prejudiced his defense. Berryman asserts that Edge, who passed away in February 2018, could have provided helpful testimony in support of his defense of necessity. As set out above, Berryman claimed that he took the rifle[7] from Thacker and maintained possession of it only to prevent Thacker from killing him, and the jury was instructed on Berryman's defense of necessity. Berryman argues that Edge would have supported this defense because, according to Berryman, Edge was sitting on his porch when Berryman walked back to the Thacker/Alexander trailer, and Edge could have testified that

---

[7] The indictment and jury instructions specifically identified the rifle as the relevant gun and did not mention the pistol.

Berryman was not carrying a rifle at that time.

¶50. Berryman claimed that his account of what Edge would have testified to could be corroborated, but he failed to produce any corroborating evidence. Berryman claimed that Edge told another neighbor, Brooks, what he would testify to. Berryman also testified that he kept in touch with Brooks through letters and by telephone while he was incarcerated. However, Berryman failed to call Brooks as a witness at the speedy-trial hearing. Berryman also claimed that Edge wrote a letter to the Parole Board in support of Berryman. However, Berryman did not have a copy of the letter. Moreover, prior to Edge's death, Berryman never informed law enforcement that Edge possessed exculpatory information.

¶51. In *Woodall*, *supra*, the Supreme Court held that a defendant failed to establish prejudice because he "offered no concrete proof, other than his broad assertions, as to what relevant knowledge [a deceased witness] had in [the] matter" or what the deceased witness "would have testified to if alive." *Woodall*, 801 So. 2d at 686-87 (¶¶26, 29). The Supreme Court reasoned that the defendant's claim of prejudice "remain[ed] speculative" because the defendant failed to preserve the deceased witness's testimony "through deposition, written or recorded statement, or otherwise." *Id.* at 687 (¶29) (quotation marks omitted). The Court stated that "[t]he assertions of [the defendant] and his attorney [did] not constitute substantial, credible evidence" to support his claim. *Id.* Likewise in this case, Berryman offered only unsubstantiated assertions regarding Edge's possible testimony. Berryman offered "no concrete proof" that Edge could have exculpated him.

¶52. Moreover, the exculpatory inference that Berryman would have us draw from the

testimony that Edge allegedly could have given was directly contradicted by Berryman's own signed statement. As set out above, Berryman himself stated, "I grabbed *my* .22 rifle and *my* .380 pistol and drove over to [Thacker's] trailer." (Emphasis added). Given that Berryman himself told Investigator Mitchell that he took two guns—*his* guns—to Thacker's trailer, we cannot say that Berryman was prejudiced by the absence of Edge's testimony that he saw Berryman without a rifle at another point in the night. In short, we agree with the trial judge's finding that Berryman was not actually prejudiced in his defense of the felon-in-possession charge. The absence of actual prejudice "weighs heavily against [the defendant] and in favor of the State." *DeLoach v. State*, 722 So. 2d 512, 518 (¶23) (Miss. 1998).

### 5. Summary of the *Barker* Factors

¶53. In weighing the *Barker* factors, we must consider the "totality of the circumstances," and "no one factor is dispositive." *Price v. State*, 898 So. 2d 641, 648 (¶11) (Miss. 2005). The factors are not a "mathematical formula." *Id.* "The weight given each [of the *Barker* factors] necessarily turns on the peculiar facts and circumstances of each case, the quality of evidence available on each factor and, in the absence of evidence, identification of the party with the risk of non-persuasion." *Jaco v. State*, 574 So. 2d 625, 630 (Miss. 1990).

¶54. Here, the overall length of the delay from arrest to trial is presumptively prejudicial. With respect to the second factor, the investigative delay of approximately seven months is considered neutral or weighs slightly against the State, the post-indictment delay of approximately fourteen months weighs heavily against the State, and the post-arraignment delay of approximately nineteen months occurred for various reasons that are considered

22

neutral. We do not believe that any material delay can be attributed to Berryman. Therefore, the reasons-for-the-delay factor weighs in favor of Berryman. In addition, Berryman clearly asserted his right to a speedy trial, so the third *Barker* factor also weighs in favor of Berryman. However, the fourth factor weighs in favor of the State because Berryman did not meet his burden of proving actual prejudice.

¶55.    In prior cases in which the first three *Barker* factors favored the defendant, but the defendant did not prove actual prejudice, the Mississippi Supreme Court has found no violation of the right to a speedy trial. For example, in *Flora*, approximately twenty-seven months passed between the defendant's arrest and trial, and the Supreme Court held that "the reason for the delay factor weigh[ed] in favor of [the defendant]" and that the third factor also favored the defendant because it was "undisputed that [he] asserted his . . . right to a speedy trial on several occasions." *Flora*, 925 So. 2d at 815, 817-18 (¶¶62, 66-67). However, the Court found that the defendant proved "no actual prejudice" and then held, "Under the totality of the circumstances, and upon examination and analysis of the *Barker* factors, we conclude that [the defendant's] constitutional right to a speedy trial was not violated." *Id.* at 818-19 (¶69).

¶56.    Similarly, in *Manix v. State*, 895 So. 2d 167 (Miss. 2005), there was an "extreme" delay of more than four years between indictment and trial, *id.* at 172, 175 (¶¶4, 15), and the second and third factors also weighed in favor of the defendant, *id.* at 176 (¶¶20-21). However, the Supreme Court held that the defendant "failed to prove actual prejudice" because he made only "[v]ague allegations of the existence of a poorly identified exculpatory

23

witness." *Id.* at 177 (¶¶22-23). The Court then stated that the defendant's "constitutional right to a speedy trial was not violated," reasoning that "any presumptive prejudice [he might] have suffered [was] overwhelmed by the absence of actual prejudice." *Id.* at (¶24); *see also Johnson*, 68 So. 3d at 1253 (¶63) & n.81 (Dickinson, P.J., dissenting) ("The last thirteen times in a row [the Mississippi Supreme] Court has reviewed cases in which three of the *Barker* factors weighed in favor of the defendant, it found no speedy-trial violation.") (collecting cases).[8]

¶57.    Likewise in this case, although it took far too long to bring this case to trial, the trial judge did not clearly err by finding that the delay did not prejudice Berryman's defense of the felon-in-possession charge. In addition, consistent with Mississippi Supreme Court precedent, we cannot say that the trial judge—who considered the totality of the circumstances, made findings of fact, and weighed all four *Barker* factors—erred by finding no violation of Berryman's right to a speedy trial. *See Flora*, 925 So. 2d at 818-19 (¶69); *Manix*, 895 So. 2d at 177 (¶24).

### B.    Statutory Right

¶58.    Berryman also alleges a denial of his statutory right to a speedy trial. Mississippi

---

[8] Consistent with Mississippi Supreme Court precedent, this Court has also found no speedy-trial violation in cases in which the first three *Barker* factors favored the defendant, but the defendant failed to prove actual prejudice. *See, e.g.*, *May*, 285 So. 3d at 653 (¶50) (holding that a defendant's right to a speedy trial was not violated by a five-year delay between arrest and trial because "[t]he absence of any prejudice to [his] defense weigh[ed] heavily in favor of the State and outweigh[ed] the other *Barker* factors"); *Reed*, 191 So. 3d at 141-42 (¶21) (holding that a defendant's right to a speedy trial was not violated by a twenty-month delay because the absence of "actual prejudice" outweighed the other *Barker* factors); *McCain v. State*, 81 So. 3d 1130, 1136 (¶21) (Miss. Ct. App. 2011) (same), *aff'd*, 81 So. 3d 1055 (Miss. 2012).

Code Annotated section 99-17-1 (Rev. 2020) provides that "[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." In this case, 594 days passed between Berryman's arraignment and trial. However, the trial judge found that Berryman's right to a speedy trial was not violated because fewer than 270 of those days were attributable to the State and because Berryman suffered no prejudice.

¶59. As our Supreme Court recently explained, "non-compliance [with the speedy-trial statute] does not itself evince a violation of the defendant's rights. Indeed, a defendant must show the State not only violated the statute, but the violation resulted in actual prejudice to his or her defense." *Williams v. State*, 305 So. 3d 1122, 1133-34 (¶39) (Miss. 2020) (citation omitted). Here, Berryman cannot show that the alleged violation of the speedy-trial statute caused him any prejudice because Edge passed away prior to Berryman's arraignment, i.e., before his statutory right to a speedy trial even attached.[9] Therefore, Edge's unavailability was not due to the alleged violation of the statute. Berryman does not identify any other form of prejudice. Accordingly, "his statutory speedy trial right was not violated." *Williams*, 305 So. 3d at 1134 (¶39). For that reason, it is unnecessary to determine whether there was good cause for the various continuances granted between the arraignment and the trial.

### C. The Dissent

---

[9] *See Perry v. State*, 419 So. 2d 194, 198 (Miss. 1982) ("[O]ur speedy trial statute is plain and unambiguous, and it requires that the defendant be tried no later than 270 days after arraignment unless good cause be shown. Thus, under this statute, the time prior to arraignment is not computed to determine compliance with the statute.").

¶60. As noted above, the trial judge in this case dismissed Count I of the indictment for shooting into a dwelling based on a violation of Berryman's right to a speedy trial on that charge. The trial judge found that the delay in bringing Berryman to trial had prejudiced his defense on that charge only and, further, that a balancing of the *Barker* factors weighed in favor of the dismissal of that charge only. In dissent, Judge McCarty argues that a court can never dismiss fewer than all counts of an indictment as a remedy for a speedy-trial violation.[10] The dissent argues that the only possible remedy for a speedy-trial violation is "the dismissal of the *entire* indictment." *Post* at ¶91 (emphasis by the dissent). We disagree.

¶61. In *Barker*, the United States Supreme Court said that "dismissal of the indictment" is "the only possible remedy" for a speedy-trial violation, *Barker*, 407 U.S. at 522, but the Court never used the phrase "the *entire* indictment." More important, neither *Barker* nor any other case cited by the dissent even considered the argument that the dissent makes here. When the Court stated in *Barker* that "dismissal of the indictment" was "the only possible remedy" for a speedy-trial violation, it was not addressing the question whether specific counts could be dismissed. The United States Supreme Court has stated that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *see also Lange v. California*, 141 S. Ct. 2011, 2019 (2021) (explaining that a prior opinion decided only the specific issue it addressed, although the Court had "framed [its] holding in broader terms"). That admonition is on-point here. Language from the *Barker* opinion should not be wrenched

---

[10] Berryman does not make this claim as part of his own speedy-trial argument.

from its context and treated as controlling on an issue that the *Barker* Court did not even consider, let alone decide.

¶62.    Moreover, a review of the *Barker* opinion as a whole shows that the dismissal of specific charges is consistent with *Barker*'s analysis and may be appropriate in some cases. In *Barker*, the Court stated that "the right to speedy trial is a more vague concept than other procedural rights" and that "[i]t is . . . impossible to determine with precision when the right has been denied."  *Barker*, 407 U.S. at 521.  As discussed above, *Barker*'s four-factor "balancing test" "necessarily compels courts to approach speedy trial cases on an ad hoc basis."  *Id.* at 530.

¶63.    In practice, *Barker*'s fourth factor—prejudice—often proves to be the most important in the analysis.  While "an affirmative demonstration of prejudice" is not strictly "necessary to prove a denial of the constitutional right to a speedy trial," *Moore v. Arizona*, 414 U.S. 25, 26 (1973), the absence of prejudice may outweigh the other three factors.  *See supra* ¶¶55-56; *see also Woodall*, 801 So. 2d at 685 (¶24) ("[W]e have remained reluctant to uphold dismissal of charges on speedy trial grounds where the defendant suffered no actual prejudice.").  And although prejudice may consist of "oppressive pretrial incarceration" or "anxiety and concern," the "most important" or "most serious" consideration is whether the delay in bringing the defendant to trial actually impaired his ability to defend himself. *Barker*, 407 U.S. at 532; *Hersick*, 904 So. 2d at 123 (¶18).  Prejudice of this type arises when evidence or witnesses are lost during the delay or when defense witnesses' memories fade due to the passage of time.  *Barker*, 407 U.S. at 532.

27

¶64. Generally, a court's analysis of the first three *Barker* factors should be the same for all counts in an indictment, but the analysis of the fourth and most important factor may be different for different counts. In some cases, lost evidence or an unavailable witness may be prejudicial to the defense of one count but not others. Indeed, that is exactly what the trial judge found in this case. The judge found that the analysis of the first three *Barker* factors was "the same" for "all four counts" pending against Berryman—both counts of the indictment in this case and the two drug charges under a separate indictment. In addition, the judge "didn't find actual prejudice in three of the four" counts but did find that "there could be actual prejudice" with respect to Count I of the instant indictment (for shooting into a dwelling). Specifically, Edge's death was "enough for [the judge] to find actual prejudice" with respect to Count I only. Based on that finding, the judge dismissed Count I only. The trial judge's ruling dismissing Count I is not before us on appeal.[11] Therefore, we do not review the trial judge's finding that the delay in bringing Berryman to trial prejudiced Berryman's defense on Count I.

¶65. Accepting the trial judge's finding that Berryman's defense had been impaired as to Count I only—and that the *Barker* factors tipped in Berryman's favor on Count I only—the judge was entirely correct to dismiss only that count of the indictment. Under the "ad hoc" "balancing process" mandated by *Barker*, there is no violation of the right to a speedy trial unless the *Barker* factors "considered together" weigh in favor of the defendant. *Barker*, 407

---

[11] The State could have appealed the dismissal of Count I but did not. *See* Miss. Code Ann. § 99-35-103(a) (Rev. 2020); *State v. Berryhill*, 703 So. 2d 250, 253 (¶10) (Miss. 1997) (holding that the State may appeal from an order quashing a portion of the indictment).

U.S. at 530, 533. If those factors weigh in favor of the State with respect to a particular charge, then the defendant's right to a speedy trial on that charge simply has not been violated. And if the case may proceed to trial on that charge without violating the defendant's right to a speedy trial, then there is no legal basis for the court to grant the "unsatisfactorily severe remedy" of dismissing the charge. *Id.* at 522.

¶66. Contrary to the dissent's contention, this does not "create an unworkable morass." *Post* at ¶93. The analysis of *Barker*'s first three factors will almost always be the same for all counts of an indictment. And in cases in which a delay has impaired the defense of some counts but not others, it is hardly "unworkable" for the trial judge to make such a finding. Indeed, the trial judge in this case had no difficulty making that finding. It clearly did not "strain[] [the judge's] resources to do it in this case," as the dissent asserts. *Post* at ¶95.

¶67. In addition, there is no need to fear that there will be "twenty or thirty" different "clock[s] running for purposes of speedy trial." *Post* at ¶96. For all counts in a single indictment, there will be "only one clock." *Id.*[12] The only potential distinction among counts will be with respect to the issue of prejudice, which the trial judge in this case addressed without any great difficulty or confusion.

## II. Indictment

¶68. Berryman was indicted as a violent habitual offender under Mississippi Code Annotated section 99-19-83 (Rev. 2020). Berryman's indictment stated,

---

[12] The constitutional speedy-trial clock begins running "with the defendant's arrest, indictment, or information," whichever occurs first. *Stark v. State*, 911 So. 2d 447, 450 (¶7) (Miss. 2005).

29

> **BRIAN SCOTT BERRYMAN** is hereby charged under Mississippi Code Annotated, Section 99-19-83, 1972 as amended, to be sentenced to the maximum term of imprisonment as prescribed for such felony and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation . . . .

The indictment then identified Berryman's prior convictions—capital murder, burglary of a dwelling, armed robbery, and robbery—all of which are crimes of violence. *See* Miss. Code Ann. § 97-3-2(1)(b), (j), (o) (Rev. 2020). The indictment concluded by stating that Berryman "was sentenced to and served separate terms of one (1) year or more in a state penal institution for each" prior conviction and that at least "one of the [prior] convictions was a crime of violence, as defined by Section 97-3-2." Consistent with the indictment, the trial court sentenced Berryman pursuant to section 99-19-83 to a term of life imprisonment without eligibility for parole or early release.

¶69. On appeal, Berryman does not dispute that his prior convictions satisfy the requirements of the violent habitual offender statute. Rather, Berryman argues that he should not have been sentenced under section 99-19-83 because his indictment did not put him on notice that the State would seek a life sentence under that statute. He argues that part of his indictment suggested that he would instead be sentenced under Mississippi Code Annotated section 99-19-81 (Rev. 2015), the nonviolent habitual offender statute.

¶70. Berryman's argument is without merit. As stated above, his indictment specifically charged him under section 99-19-83. The indictment did not even mention section 99-19-81. In addition, the indictment specifically alleged that Berryman "was sentenced to *and served* separate terms of one (1) year or more" for each prior conviction. (Emphasis added). The

30

requirement that the defendant must have actually *served* separate terms of one year or more is a requirement of section 99-19-83 only; the issue is irrelevant under section 99-19-81. *See, e.g.*, *Akins v. State*, 493 So. 2d 1321, 1322 (Miss. 1986). Finally, the indictment specifically alleged that Berryman had been convicted of "a crime of violence, as defined by Section 97-3-2." A prior conviction for a crime of violence is also a requirement of section 99-19-83 only; again, the issue is irrelevant under section 99-19-81. In sum, the indictment *expressly* charged Berryman under section 99-19-83 and alleged all necessary prerequisites for sentencing under that statute. The indictment was more than sufficient to put Berryman on notice that he would be sentenced under section 99-19-83.

¶71.    The only issue that Berryman raises with his indictment is that it erroneously included language from section 99-19-81, stating that he would "be sentenced to the maximum term of imprisonment as prescribed for such felony" rather than expressly referencing the life sentence provided for in section 99-19-83. However, this Court rejected a similar argument in *Grim v. State*, 102 So. 3d 1123 (Miss. Ct. App. 2010), *aff'd*, 102 So. 3d 1073 (Miss. 2012). In *Grim*, the defendant argued that his "indictment improperly cited both . . . section 99-19-81 . . . and section 99-19-83." *Id.* at 1129 (¶23). We held that the indictment was sufficient because "the two citations . . . put [the defendant] on notice that he could be sentenced under either statute." *Id.* at 1130 (¶24). The same is true in this case. Indeed, the indictment in this case did not even mention section 99-19-81. As in *Grim*, this indictment's clear and express reference to section 99-19-83 was sufficient to "put [Berryman] on notice that he could be sentenced under [that] statute." *Id.* Accordingly, the trial court properly sentenced Berryman

31

pursuant to section 99-19-83.

## CONCLUSION

¶72.   The delay in bringing Berryman to trial did not violate his constitutional or statutory right to a speedy trial.  In addition, Berryman's indictment put him on notice that he would be sentenced to a term of life imprisonment as a violent habitual offender.

¶73.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McCARTY, J., JOINS IN PART.  McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶74.   I concur that Berryman's right to a speedy trial on Count II was not violated.  I respectfully dissent regarding the majority's opinion that the indictment provided Berryman with sufficient notice that the State was pursuing sentencing under the violent habitual offender statute, Mississippi Code Annotated section 99-19-83 (Rev. 2020).

¶75.   Berryman argues that the circuit court erred in sentencing him to life without parole under Mississippi Code Annotated section 99-19-83[13] because the indictment was defective.

---

[13] "Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not, in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, *shall be sentenced to life imprisonment*, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation or any other form of early release from actual physical custody within the Department of Corrections." Miss. Code Ann. § 99-19-83 (emphasis added).

Specifically, Berryman argues that based on the language of the indictment, he was not put on notice that the State sought a life sentence under section 99-19-83.

¶76. Rule 14.1(a) of the Mississippi Rules of Criminal Procedure provides that an indictment "shall be a plain, concise and definite written statement of the essential facts and elements constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." MRCrP14.1(a). For an enhanced punishment for subsequent offenses, the State shall "specify such prior conviction(s) in the indictment, identifying each such prior conviction by the name of the crime, the name of the court in which each such conviction occurred and the cause number(s), the date(s) of conviction, and, if relevant, the length of time the accused was incarcerated for each such conviction . . . ." MRCrP 14.1(b)(1).

¶77. The Mississippi Supreme Court has held that "an indictment is generally sufficient if it tracks the language of the relevant criminal statute." *Jones v. State*, 215 So. 3d 508, 512 (¶13) (Miss. Ct. App. 2017) (quoting *Tran v. State*, 962 So. 2d 1237, 1241 (¶17) (Miss. 2007)). However, "using the exact language from the statute is not necessary if the words used have substantially the same meaning and the indictment is specific enough to give the defendant notice of the charge against [him]." *State v. Hawkins*, 145 So. 3d 636, 640 (¶8) (Miss. 2014) (citing *Madere v. State*, 794 So. 2d 200, 212 (¶33) (Miss. 2001)).

¶78. Berryman's indictment included the following language:

> BRIAN SCOTT BERRYMAN is hereby charged under Mississippi Code Annotated, Section 99-19-83, 1972 as amended, to be sentenced to the *maximum term of imprisonment as prescribed for such felony and such sentence shall not be reduced or suspended nor shall such person be eligible*

33

*for parole or probation . . . .*

The relevant felony for sentencing purposes in this case was the possession of a firearm by a felon. A conviction of this crime carries a maximum ten-year sentence. Miss. Code Ann. § 97-37-5(2) (Rev. 2014). The indictment cited section 99-19-83, which carries life imprisonment, by only referencing the section number. The indictment included no language from section 99-19-83. The language in the indictment comes from section 99-19-81,[14] stating that Berryman could only receive the maximum term of imprisonment for the felony, which in this case is ten years.

¶79. To support its argument that the indictment was not defective, the State and the majority cite *Grim v. State*, 102 So. 3d 1123 (Miss. Ct. App. 2010), *aff'd*, 102 So. 3d 1073 (Miss. 2012), where this Court found that the use of the two separate habitual offender provisions in the indictment put the defendant on notice that he could be sentenced under either provision. *Id*. at 1129-30 (¶24). In *Grim*, this Court cited *Henderson v. State*, 878 So. 2d 246, 248 (¶11) (Miss. Ct. App. 2004), in which both habitual offender statutes and language were included in the indictment. In *Henderson*, this Court stated that the "double reference was sufficient to give Henderson notice that he could be sentenced under either and gave him a fair opportunity to present a defense." *Id*. While *Grim* is not specific as to the

---

[14] "Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, *shall be sentenced to the maximum term of imprisonment prescribed for such felony* and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation." Miss. Code Ann. § 99-19-81 (Rev. 2015) (emphasis added).

language in the indictment, its reliance on *Henderson* would suggest that its facts were similar to *Henderson.*

¶80. But this case is clearly distinguishable from *Grim* and *Henderson*. In those cases, both habitual offender statutes and language were included in the indictment. Here, even the majority acknowledges that the indictment did not cite both habitual offender statutes. Berryman's indictment cited Mississippi Code Annotated section 99-19-83 by number only, but then the indictment erroneously tracked the language from Mississippi Code Annotated section 99-19-81 concerning the potential punishment Berryman faced. Mississippi Code Annotated section 99-19-81 provided that "a person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution . . . shall be sentenced to the *maximum term of imprisonment prescribed for such felony . . . .*" (Emphasis added). Thus, instead of giving Berryman notice that if convicted, he would serve life imprisonment without eligibility for parole, the State only gave Berryman notice that he would serve the maximum sentence as to the charge of possession of a firearm by a felon, without eligibility for parole, which would be ten years.

¶81. The majority ignores the fact that Berryman's indictment improperly combines section 99-19-81 and section 99-19-83. Unlike *Grim*, which listed both habitual statutes and included the language of both statutes, Berryman's indictment misstates section 99-19-83 by using section 99-19-81's language, thus misleading Berryman as to his potential punishment.

The majority attempts to bolster its argument by pointing out that the indictment did cite Mississippi Code Annotated section 97-3-2 (Rev. 2014), which contains a list of violent crimes. But the indictment's citation of the violent-crimes statute does not remedy the problem of the indictment's misstatement of the language of section 99-19-83. We cannot condone an indictment that lists one statute by number while simultaneously tracking the language of another statute. To do so is not only confusing but, more significantly, denies a defendant his right to receive fair notice and assess his risk of proceeding to trial or pleading guilty.

¶82. Furthermore, this Court and the Mississippi Supreme Court have stated in several cases that "[i]t is not necessary for the State to specify in the indictment which section of the habitual criminal statute they were proceeding under"; in those cases, the Supreme Court was examining indictments that included both habitual offender statutes. *E.g., Johnson v. State*, 50 So. 3d 335, 338-39 (¶¶13,17) (Miss. Ct. App. 2010) (quoting *Ellis v. State*, 469 So. 2d 1256, 1258 (Miss. 1985)); *accord Osborne v. State*, 404 So. 2d 545, 548 (Miss. 1981).[15]

---

[15] We used similar language in *Frazier v. State*, 907 So. 2d 985, 990 (¶12) (Miss. Ct. App. 2005), but that case is inapplicable to the case at hand. In *Frazier*, the defendant was sentenced under section 99-19-81 after his indictment was amended. *Id*. at (¶13). He received the maximum sentence for the felony for which he was charged, not life imprisonment. *Id*. On appeal, he sought to have his case reversed because the *order* amending the indictment contained inconsistencies. *Id*. at 990 (¶9). But the claimed inconsistencies did not affect Frazier's sentence, and he was properly sentenced. Because the motion to amend the indictment plainly announced that the State would proceed under section 99-19-81 and requested a five-year sentence, and the order allowing the amendment listed section 99-19-81, we found that the inconsistency in the order amending the indictment was not so misleading that Frazier experienced any prejudice. *Id*. at 991 (¶13). In Berryman's case, the indictment was initially flawed, improperly combining the citation of section 99-19-83 with the language of section 99-19-81, and never amended. Moreover, Berryman received the harsher life-imprisonment sentence, where Frazier did not.

36

¶83.    In this case, the State erroneously combined the citation of section 99-19-83 with the language of section 99-19-81.  If anything, the language in the indictment put Berryman on notice that if convicted he would only serve the ten-year maximum sentence prescribed by the felony statute.  Additionally, while we recognize that the State listed Berryman's prior convictions pursuant to Rule 14.1(b) of the Mississippi Rules of Criminal Procedure, because the State listed section 99-19-83 but tracked the language of 99-19-81, the indictment was ambiguous as to which habitual offender statute was applicable.  The indictment, at best, was confusing; at worst, it failed to give Berryman notice that he could serve life in prison.  Under our rules, defendants should be given clear notice of the charges against them and the punishment sought.

### Conclusion

¶84.    In sum, I concur in part with the majority that Berryman's right to a speedy trial was not violated on Count II of the indictment.  However, I dissent in part because Berryman's indictment was defective and failed to provide with him sufficient notice that he could be sentenced to life without eligibility for parole as a violent habitual offender under section 99-19-83.  Therefore, I would reverse in part and render a sentence of ten years' incarceration based on section 99-19-81.

**WESTBROOKS, J., JOINS THIS OPINION.  McCARTY, J., JOINS THIS OPINION IN PART.**

**McCARTY, J., DISSENTING:**

¶85.    Because I believe precedent compels the dismissal of the entire indictment when a trial court finds that the right to a speedy trial was violated on a count within the indictment,

37

I respectfully dissent.

¶86. As the United States Supreme Court explained, there is only one possible remedy for a violation of the "amorphous" right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 522 (1972). The sole cure for a violation is the "severe remedy of dismissal of the indictment when the right has been deprived." *Id*. "This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried." *Id*. "Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but *it is the only possible remedy*." *Id*. (emphasis added).

¶87. Our Mississippi Supreme Court has agreed that "[t]he *sole* remedy for the denial of a defendant's right to a speedy trial is dismissal of the *charges* against him." *Taylor v. State*, 672 So. 2d 1246, 1262 (Miss. 1996) (emphases added); *see Smith v. State*, 550 So. 2d 406, 409 (Miss. 1989) ("Of course, the sole remedy for denial of a defendant's right to a speedy trial is dismissal of the charges against him.").

¶88. Similarly, the Fifth Circuit has ruled under the federal Speedy Trial Act that "[i]f a defendant is not brought to trial within this period, then *the indictment* must be dismissed." *United States v. Jones*, 56 F.3d 581, 583 (5th Cir. 1995) (emphasis added); *see also United States v. Neal*, 27 F.3d 1035, 1042 (5th Cir. 1994) ("If the Act is violated, the indictment must be dismissed."); *United States v. Rogers*, 781 F. Supp. 1181, 1185 (S.D. Miss. 1991) ("If, on balancing these factors, a violation is found, dismissal of the indictment is the only possible remedy.").

¶89. So it is well established that the "only possible remedy" for a violation of the right to

speedy trial is to dismiss the entire indictment. Yet in this case, the trial court segmented its analysis, looking at each charge separately, and examining the prejudice present to each charge. As to Count I, shooting into an occupied dwelling, the trial court found that the defendant would suffer prejudice because of the death of two witnesses who would bolster his defense. Accordingly, the trial court found this prejudice triggered dismissal of the charge for violation of the speedy-trial right.

¶90. However, the trial court then proceeded to analyze whether that same prejudice infected the other crimes with which the defendant was charged. The trial court reasoned that the "proposed testimony" of one of the deceased witnesses "has no bearing on whether Defendant, as a convicted felon, possessed the gun that was discovered in the house in which he was staying." Similarly, the trial court concluded that "[n]either deceased witness was presented as having any evidence bearing on the drug charges" from a separate indictment, so "the Court therefore [found] no prejudice as to these charges."

¶91. Yet in dismissing only *one* of the charges due to a speedy-trial violation, the trial court created a *new* remedy. While the United States Supreme Court concluded in *Barker* that "the only possible remedy" is the dismissal of the *entire* indictment, and our Supreme Court has held *all* charges must be dismissed, the trial court in this case dismissed only *some* of the charges. No matter how well-meaning, this ruling plainly does not comport with clearly established constitutional law.

¶92. As a result, since "the only possible remedy" is the "severe remedy of dismissal of the indictment when the right has been deprived," we are bound by federal and State precedent

39

to reverse and render.[16]

¶93.    To do otherwise would be to suddenly create an entirely new analysis for purposes of speedy trial.  There is a reason the entire indictment is dismissed and not just individual charges. It is complicated enough for courts to calculate the fluid *Barker* factors for an indictment as a whole.  It would create an unworkable morass if trial and appellate courts had to analyze *each* individual count in an indictment to ascertain if there was a speedy trial violation.

¶94.    As one court has interpreted *Barker*, it is actually this "severe remedy" of total dismissal that distinguishes a speedy-trial violation.  "There is no intermediate remedy for a violation of the speedy trial right such as the exclusionary rule or a new trial" since the only remedy is dismissal.  *State v. Reynolds*, 95 A.3d 973, 977 (¶7) (Vt. 2014).  Nonetheless, the trial court here crafted an "intermediate remedy" of carving off one charge from multiple. Yet the constitutional right to a speedy trial cannot be divvied up.

¶95.    It strains resources to do it in this case, where the defendant was charged with two counts in the indictment; it would be nearly impossible when a defendant was charged with

---

[16] In light of the extreme language deployed by the United States Supreme Court in *Barker*—in which it lamented the "serious consequence" of a dismissal due to a violation of the right to a speedy trial—I see this as the only possible interpretation of speedy-trial precedent.  The majority is wholly correct that neither *Barker* nor any of the other cases cited in this separate opinion address a situation where a trial court found one count in an indictment should be dismissed under a speedy-trial violation while other counts could proceed to trial.  Indeed, this is in part because there does not seem to be any other case where such an approach was taken.

Barker held that the "only possible remedy" was dismissal, not "one of the possible remedies."  *Barker*, 407 U.S. at 522.  Applying that holding to this case, there is only one remedy, and that is full dismissal of all charges.

the commission of ten or twenty or even thirty crimes. *See Terrell v. State*, 160 So. 3d 213, 214 (¶1) (Miss. 2015) (where a defendant was indicted for a whopping "twenty counts of mail fraud, conspiracy to commit mail fraud, fraudulent use of identity, conspiracy to commit fraudulent use of identity, timber theft, conspiracy to commit timber theft, false pretense, and conspiracy to commit false pretense"); *Sowers v. State*, 101 So. 3d 1156, 1157 (¶6) (Miss. 2012) (where defendant was indicted on 31 counts of two separate crimes).

¶96. There should only be one clock running for purposes of speedy trial, not twenty or thirty. Indeed, even when there are multiple defendants, there is only one clock. *See United States v. Cope*, 312 F.3d 757, 776-77 (6th Cir. 2002) (holding that under the federal Speedy Trial Act, when "multiple defendants are charged together and no severance has been granted, one speedy trial clock governs"); *accord Flores v. State*, 574 So. 2d 1314, 1321 (Miss. 1990) ("[S]ince the right to a speedy trial is a right personal to the accused, the right should not be waived because of delays occasioned by a co-defendant for which the accused was not in any way responsible.").

¶97. Courts have grappled with the "multiple clock" issue before, but normally when there are multiple indictments or new co-defendants. In Mississippi, "[t]he prosecution may not circumvent an accused's demand for a speedy trial by seeking a new indictment for the *same offense* and then proceeding upon the new indictment." *Taylor v. State*, 672 So. 2d 1246, 1257 (Miss. 1996) (emphasis added).[17]

---

[17] However, if the original indictment is dismissed, the speedy-trial clock is restarted with the re-indictment. *See Murray v. State*, 967 So. 2d 1222, 1229 (Miss. 2007) (Where defendant's first indictment was dismissed by nolle prosequi, the date of the original indictment did not count towards the speedy trial analysis when he was re-indicted later.);

¶98.    Likewise, in the Fifth Circuit, "[t]he filing of a superseding indictment does not affect the speedy trial clock for offenses charged in the original indictment or any offense required to be joined under double jeopardy principles." *United States v. Bermea*, 30 F.3d 1539, 1567 (5th Cir. 1994).  Under this interpretation of the law, "[t]he clock continues to run from the original indictment or arraignment, whichever was later, and all speedy trial exclusions apply as if no superseding indictment had been returned."  *Id*.  This approach "prevents the government from circumventing the speedy trial guarantee through the simple expedient of obtaining superseding indictments with minor corrections."  *Id*.; *but see United States v. Harris*, 566 F.3d 422, 429 (5th Cir. 2009) (When a subsequent indictment widens the scope of the criminal investigation, such as by adding new conspirators, "the starting point for the speedy trial clock is . . . reset to the date of the arraignment on the superceding indictment.").

¶99.    Similarly, in Ohio, a subsequent indictment "made against an accused would be subject to the same speedy-trial constraints as the original charges, if additional charges arose from the same facts as the first indictment."  *State v. Baker*, 676 N.E.2d 883, 885 (Ohio 1997).  However, "[a]dditional crimes based on different facts should not be considered as arising from the same sequence of events for the purposes of speedy-trial computation."  *Id*. at 885-86; *see also State v. Parker*, 863 N.E.2d 1032, 1036 (¶20) (Ohio 2007) ("[S]peedy-trial time is not tolled for the filing of later charges that arose from the facts of the criminal incident that led to the first charge.").

¶100.  So under these state and federal approaches to new indictments, even if the defendant

_____

*Forrest v. State*, 782 So. 2d 1260, 1268 (Miss. Ct. App. 2001) ("[T]he 270 day right should begin at the date of the new indictment.").

in this case had been separately indicted for the crimes in this case, all the charges against him that "arose from the same facts" are still subject to the *same* speedy-trial clock. Under this analogous precedent, whether in one indictment or many, if the charges arise from the same facts, they are subject to one clock. I find a "one clock" approach monumentally clearer than the one implicitly adopted by the majority today.

¶101. I further write separately to emphasize that Berryman spent an estimated 1,234 days under the control of the State before his trial. This, despite the assurance that "[t]he history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution." *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967). There the Supreme Court traced the American right to a speedy trial back to English guarantees of due process and liberty announced in 1215 and 1166. *Id*. at 223. The Court noted that the Virginia Declaration of Rights enshrined it at the very dawn of our country in 1776, establishing that "a man ha[s] a right to . . . a speedy trial." *Id*. at 225. Our state followed suit. *See* Miss. Const. art. 3, § 26 ("[T]he accused shall have a right to . . . a speedy and public trial by an impartial jury[.]").

¶102. The right to a speedy trial should be treated no less and no more than our sacred rights to speak our minds or to bear arms in defense of our homes, or our right to even *have* a trial should we be arrested. We should not allow a constitutional right to be fumbled away by bureaucracy and confusion, as it was in this case. Nor should its deprivation be used to oppress our citizens.[18]

---

[18] "One of the concerns of criminal defendants in the Mississippi of times past was not the deprivation of a speedy trial," but in trial being held so quickly they could not

¶103. Once upon a time the Mississippi Supreme Court held, "The right to a speedy trial means what it says." *Flores*, 574 So. 2d at 1323. Because the right must mean what it says as to *all* charges, and not just for some, the "only possible remedy" is to dismiss the entire indictment and any charges stemming from the same factual nexus. Therefore, I respectfully dissent from the conclusion that Berryman's speedy-trial right was not violated.

---

adequately prepare. *Guice v. State*, 952 So. 2d 129, 145 (Miss. 2007) (Diaz, P.J., dissenting) (collecting cases showing how the shift over time from ultra-speedy time to trial to ultra-delays in trial); *see Robinson v. State*, 223 Miss. 70, 82, 77 So. 2d 265, 269 (1955) (affirming a conviction of death for conviction of rape when sentencing was only *six days* from the attack).